**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| | |
|---|---|
| Raymond Monsoor and Laura Porras, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>Ocuco, Inc.,<br><br>*Defendant*. | No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR A JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiffs, Raymond Monsoor and Laura Porras ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendant, Ocuco, Inc. ("Defendant" or "Ocuco"), upon personal knowledge as to their own acts, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1. This class action arises out of the recent data security incident and data breach that was perpetrated against Defendant (the "Data Breach"), which held in its possession certain personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of individuals whose information was provided to Defendant's eyecare provider customers in connection with eye examinations, optical services, and healthcare claims.

2. Defendant provides optical software solutions such as practice management and electronic health record systems for thousands of eyecare practices, clinics, and lens manufacturing labs.

3. In the course of providing these services to eyecare providers, Defendant received PII and PHI from numerous individuals, including Plaintiffs. In turn, Defendant came into the possession of, and maintains extensive files

containing PII and PHI of these individuals, and owes these individuals an affirmative duty to adequately protect and safeguard this private information against theft and misuse. Despite such duties created by statute, regulation, and common law, at all relevant times, Defendant utilized deficient data security practices, thereby allowing sensitive and private data to fall into the hands of strangers.

4. On or around April 1, 2025, Defendant discovered that an unauthorized third party obtained access to "two non-production servers and certain files stored therein between March 28, 2025 and April 1, 2025."[1]

5. Defendant began notifying individuals of the breach on June 20, 2025.[2]

6. But for Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect these patients' PII and PHI, the Data Breach would not have occurred.

7. Defendant is well-aware that it is at high risk of attempted cyberattack due to the high value of the sensitive data.

8. Despite Defendant's awareness of both the value and sensitivity of the data it safeguarded and serious risk presented by insufficient security practices,

---

[1]Notice of Data Breach, *available at* https://www.ocuco.com/notice-of-data-breach/ (last accessed July 17, 2025).
[2]https://www.mass.gov/doc/2025-1068-ocuco/download (last accessed July 22, 2025).

Defendant did not take sufficient steps to ensure that its systems were secure. Defendant knew or should have known about the risk to the data it stored and processed, and the critical importance of adequate security measures in the face of increasing threats.

9. The Data Breach was directly and proximately caused by Defendant's failure to implement reasonable and industry-standard data security practices necessary to protect its systems from a foreseeable and preventable cyberattack. Through this wrongful conduct, the sensitive PII and PHI of over 200,000 individuals is now in the hands of cybercriminals, who target this sensitive data for its value to identity thieves. Plaintiffs and Class Members are now at a significantly increased and impending risk of fraud, identity theft, and similar forms of criminal mischief—risks which may last the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes. Moreover, Plaintiffs and Class Members have lost the inherent value of their private data.

10. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to

open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose PII was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security. Likewise, the exfiltration of protected health information puts Plaintiffs and the Class Members at a present and continuing risk of medical identity theft, which poses an even more critical threat to victims because such fraud could lead to loss of access to necessary healthcare through misuse of paid-for insurance benefits or by incurring substantial medical debt.

11. Moreover, Defendant's failure to notify Plaintiffs and Class Members that they had been impacted by this data breach for nearly three months after Defendant became aware of the breach harmed Plaintiffs and made it more difficult for Plaintiffs to take swift action to respond to the breach.

12. Plaintiffs and Class Members have been harmed because they are at immediate risk of having their personal information used against them. Indeed, they have been at risk well before Defendant even notified Plaintiffs of the breach. Plaintiffs do not know if their data has been sold, transferred, replicated, or irrevocably disseminated and exposed. Plaintiffs have suffered harm in the loss of the value of their data which cannot be easily recovered, if ever.

13. Plaintiffs, individually and on behalf of a nationwide class, allege claims of (1) Negligence, (2) Negligence *Per Se*, (3) Breach of Implied Contract, (4) Unjust Enrichment, (5) violation of the Minnesota Deceptive Trade Practices Act, (6) violation of the Minnesota Health Records Act; and (7) violation of Oregon's Unlawful Trade Practices Act. Plaintiffs also seek declaratory and injunctive relief. Plaintiffs ask the Court to compel Defendant to adopt reasonable information security practices to secure the sensitive PII and PHI that Defendant collects and stores in its databases and to grant such other relief as the Court deems just and proper.

## PARTIES

***Plaintiffs***

14. Plaintiff Raymond Monsoor is and at all times mentioned herein an individual citizen of the State of Minnesota, residing in the city of Austin.

15. Plaintiff Laura Porras is and at all times mentioned herein an individual citizen of the State of Oregon, residing in the city of Portland.

***Defendant***

16. Defendant Ocuco, Inc. is a foreign corporation organized and existing under the laws of the State of Delaware and maintains a principal place of business at 13135 66th Street North, Largo, Pinellas County Florida 33773.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

18. This Court has personal jurisdiction over Defendant through its business operations in this District, the specific nature of which occurs in this District. Defendant's principal place of business is in this District. Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Defendant is also based in this District, maintains Plaintiffs' and Class Members' Private Information in this District, and has caused harm to Plaintiffs and Class Members from and/or in this District.

## FACTUAL ALLEGATIONS

### I. Background

20. Ocuco was founded in Dublin, Ireland in 1993.[3]

[3] https://www.linkedin.com/company/ocuco (last accessed July 22, 2025).

21. Ocuco represents itself as the "largest optical retail software company in the world" with over 7,500 sites in 77 countries using Ocuco's software and services.[4]

22. Ocuco represents itself as "a pioneer of software solutions for the ophthalmic retail markets."[5]

23. Ocuco serves optical retailers, eye hospitals, and optical labs and has "a singular ambition: to harness cutting-edge technology to build the digital framework for the future of eyecare."[6]

24. Ocuco has two global products: "Patient Relationship Management Software (Practice Management and Electronic Health Record) and a Lab Management System (LMS) for the Optical industry."[7]

25. As a condition of providing these services, Ocuco requires that its clients entrust it with highly sensitive personal information belonging to their patients and customers. In the ordinary course of receiving service from Ocuco's clients, Plaintiffs and Class Members were required to provide their Private Information to Defendant.

---

[4] *Id.*
[5] *Id.*
[6] Your Software Partner, *available at* https://www.ocuco.com/company/about-us/ (last accessed July 22, 2025).
[7] https://www.linkedin.com/company/ocuco (last accessed July 22, 2025).

26. Defendant represents that "Your privacy is of paramount importance to us."[8]

27. Defendant's Privacy & Cookies Policy ("Privacy Policy") states that:

> We restrict access to Your Personal Data to employees, contractors, and agents who need such access in order to operate, develop, or improve our Service. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination, civil litigation and/or criminal prosecution, if they fail to meet these obligations. We may also share Your Personal Data with our third party suppliers who assist us in the provision of the Service.
>
> We also share Your Personal Data with various third parties such as business partners, suppliers and sub-contractors for the performance of any contract we enter into with them (subject to having appropriate contracts in place with such third parties to ensure compliance with Data Protection Legislation).[9]

28. Defendant further claims that:

> We will implement appropriate technical and organisational measures to ensure a level of security appropriate to the risks that are presented by the processing of Your Personal Data. In particular, we will consider the risks presented by accidental or unlawful destruction, loss, alteration, unauthorised disclosure of, or access to Your Personal Data transmitted, stored or otherwise processed.[10]

---

[8] Ocuco Limited – Privacy & Cookies Policy, *available at* https://www.ocuco.com/privacy-policy/ (last accessed July 22, 2025).
[9] *Id.*
[10] *Id.*

## II. The Breach

29. On April 1, 2025, Defendant "learned that a third party was claiming to have stolen information from its environment via a posting on the unindexed internet (also known as the dark web)."[11]

30. After further investigation, Defendant learned that "an unauthorized actor accessed two non-production servers and certain files stored therein between March 28, 2025, and April 1, 2025, and some files were copied from one of those servers between March 30, 2025, and April 1, 2025."[12]

31. Through the Data Breach, the cybercriminal gained unauthorized access to highly sensitive Private Information, including "name, address, Social Security number, medical record number, health insurance number, provider name, prescriptions or medications, treatment or diagnosis, lab results, medical history, payment for health services, workers' compensation claims with medical information, health insurance coverage information, health insurance claim information, financial account number without access information, and driver's license number."[13]

---

[11] Notice of Data Breach, *available at* https://www.ocuco.com/notice-of-data-breach/ (last accessed July 22, 2025).
[12] *Id.*
[13] *Id.*

32. Ransomware group KillSec claimed that it has more than 340 gigabytes of Defendant's data, which includes 670,344 files and 26,838 folders.[14]

33. On or around June 20, 2025, almost three months after Defendant learned that the information was accessed by cybercriminals, Defendant began to notify Plaintiffs and other Class Members that their Private Information was viewed and taken by cybercriminals.

34. The Data Breach Notices do not provide details about the root cause of the Data Breach, the vulnerabilities exploited, the criminals responsible for the breach, and the remedial measures undertaken to ensure such a breach does not occur again. To date, Defendant has not explained or clarified these facts with Plaintiffs and Class Members.

35. Without these details, Plaintiffs' and Class Members' ability to mitigate harms resulting from the Data Breach is severely diminished.

36. Defendant's Data Breach notice offers no substantive steps to help victims like Plaintiffs and Class Members to protect themselves other than providing two years of credit monitoring, which is woefully inadequate considering the lifelong increased risk of fraud and identity theft that Plaintiffs and Class Members now face as a result of the Data Breach.

[14] Marianne Kolbasuk McGee, *2 Software Firms Report Major Health Data Theft Hacks*, BANK INFO SECURITY (June 13, 2025), https://www.bankinfosecurity.com/2-software-firms-report-major-health-data-theft-hacks-a-28699 (last accessed July 22, 2025).

## III. The Healthcare Sector Is Increasingly Susceptible to Data Breaches, Giving Defendant Ample Notice That It Was a Likely Cyberattack Target

37. At all relevant times, Defendant knew, or should have known, that the PII and PHI it was entrusted with was a target for malicious actors. Defendant knew this given the unique type and the significant volume of data on its networks, servers, and systems, comprising individuals' detailed and confidential personal information and, thus, the significant number of individuals who the exposure of the unencrypted data would harm.

38. As custodian of Plaintiffs' and Class Members' PII and PHI, Defendant knew or should have known the importance of protecting their PII and PHI, and of the foreseeable consequences and harms to such persons if any data breach occurred.

39. Defendant was on notice that the FBI has been long concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the

purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[15]

40. In January 2023, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the severe threats posed by cybercriminal groups.[16]

41. Defendant's security obligations were especially important due to the substantial increase of cyberattacks and data breaches in recent years, particularly those targeting healthcare businesses and other organizations like Defendant, which store and maintain large volumes of PII and PHI. These largescale cyberattacks are increasingly common and well-publicized. Through the end of November 2023, 640 largescale cyberattacks had targeted hospitals, health systems, and healthcare records in 2023, affecting more than 115 million people—making 2023 the "worst-ever year for breached healthcare records."[17]

---

[15]Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity- healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers- idUSKBN0GK24U20140820.

[16]*See* Royal & BlackCat Ransomware: The Threat to the Health Sector, *available at* https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last accessed June 24, 2025).

[17]November 2023 Healthcare Data Breach Report, THE HIPAA JOURNAL (Dec. 21, 2023), https://www.hipaajournal.com/november-2023-healthcare-data-breach-report/.

42. The cybercriminals that obtained Plaintiffs' and Class Members' Private Information appear to be from the Killsec ransomware group.[18]

43. The Killsec ransomware group claimed credit for the Data Breach on its Dark Web website.[19]

44. Killsec's "activities appear to have begun in October 2023" and at least 20 percent of their attacks have targeted the healthcare sector.[20]

45. Ransomware groups such as Killsec often post links to stolen data on a Data Leak Site ("DLS").[21] A DLS is a "website where the illicitly retrieved data of companies, that refuse to pay the ransom, are published."[22]

46. However, even if a ransomware group removes stolen data from its DLS when a ransom is paid, there is no guarantee that the data will be deleted.[23] The stolen Private Information is valuable, and can easily be sold to another threat actor, so there is little incentive to delete it.[24]

---

[18] Steve Alder, *Ocuco Issues Notifications About 241K Record Data Breach*, THE HIPAA JOURNAL (July 14, 2025), https://www.hipaajournal.com/ocuco-data-breach/ (last accessed July 22, 2025).
[19] *Id.*
[20] Dark Web Profile: KillSec, SOCRADAR (Nov. 7, 2024), https://socradar.io/dark-web-profile-killsec/ (last accessed July 22, 2025).
[21] Steve Alder, *Majority of Ransomware Victims That Pay a Ransom Suffer a Second Attack*, THE HIPAA JOURNAL (Feb. 23, 2024), https://www.hipaajournal.com/majority-of-ransomware-victims-that-pay-a-ransom-suffer-a-second-attack/#:~:text=While%20ransomware%20groups%20usually%20remove,little%20incentive%20to%20delete%20it. (last accessed July 23, 2025).
[22] *Dedicated Leak Sites (DLS): Here's what you should know*, GROUP-IB, https://www.group-ib.com/resources/knowledge-hub/dedicated-leak-sites/ (last accessed April 3, 2025).
[23] Alder, *supra* note 21.
[24] *Id.*

47. Ransomware groups can therefore monetize stolen Private Information and sell it on the dark web as part of a full identity profile.[25] Buyers can then use that information to conduct different types of identity theft or fraud, such as to file a fake tax return, to apply for a fraudulent mortgage or to open a bank account while impersonating the victim.[26]

48. Patient records, such as those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail."[27] The record sets are then sold on Dark Web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[28]

49. With the surging number of such attacks targeting companies in the healthcare sector, Defendant knew or should have known that it was at high risk of cyberattack and should have taken additional and stronger precautions and preemptive measures.

---

[25] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (last accessed July 3, 2025).
[26] *Id.*
[27] Steve Alder, Editorial: Why Do Criminals Target Medical Records, THE HIPAA JOURNAL (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records/.
[28] *Id.*

50. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Plaintiff and Class Members at additional risk for potential medical fraud and medical identity theft.

51. Data breaches and disclosures involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[29] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[30] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

---

[29] *What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Nov. 22, 2023).
[30] *Id.*

## IV. Defendant Failed to Comply with FTC Guidelines

52. At all times relevant to this Complaint, Defendant knew or should have known the significance and necessity of safeguarding PII and PHI, and the foreseeable consequences of a data breach. Defendant knew or should have known that because it collected and maintained the PII and PHI for a significant number of patients, a significant number of patients would be harmed by a breach of its systems. Defendant further knew due to the nature of its business practices that the data it was entrusted with was highly valuable and contained private and sensitive information including medical information.

53. Because PII is so sensitive and cyberattacks have become a rising threat, the FTC has issued numerous guides for businesses holding sensitive PII and emphasized the importance of adequate data security practices. The FTC also stresses that appropriately safeguarding PII held by businesses should be factored into all business-related decision making.

54. An FTC Publication titled "Protecting Personal Information: A Guide for Business" lays out fundamental data security principles and standard practices that businesses should implement to protect PII.[31] The guidelines highlight that businesses should (a) protect the personal customer information they collect and

[31] https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business. (last accessed March 21, 2024).

store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.

55. The FTC also recommends businesses use an intrusion detection system, monitor all incoming traffic to the networks for unusual activity, monitor for large amounts of data being transmitted from their systems, and have a response plan prepared in the event of a breach.

56. The FTC also recommends that businesses limit access to sensitive PII, require complex passwords to be used on the networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

57. Businesses that do not comply with the basic protection of sensitive PII are facing enforcement actions brought by the FTC. Failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data is an unfair act or practice prohibited pursuant to Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

58. Many states' unfair and deceptive trade practices statutes are similar to the FTC Act, and many states adopt the FTC's interpretations of what constitutes an unfair or deceptive trade practice.

59. Defendant knew or should have known of its obligation to implement appropriate measures to protect PII in its possession but failed to comply with the FTC's basic guidelines.

60. Defendant's failure to employ reasonable measures to adequately safeguard against unauthorized access to PII constitutes an unfair act or practice as prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, as well as by state statutory analogs.

61. Once Defendant became aware of the breach, it could have acted far faster and more aggressively in responding to the breach and in assisting victims in redressing harms, including taking *any* steps whatsoever to attempt to mitigate the harm caused by the breach.

62. Identity thieves use such PII to, among other things, gain access to bank accounts, social media accounts, and credit cards. Identity thieves can also use this PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government identification cards, or create "synthetic identities." Additionally, identity thieves often wait significant amounts of time—months or even years—to use the PII obtained in data breaches because victims often become less vigilant in monitoring their accounts as time passes, therefore making the PII easier to use without detection. These identity thieves

will also re-use stolen PII and PHI, resulting in victims of one data breach suffering the effects of several cybercrimes from one instance of unauthorized access to their PII and PHI.

63. Victims of data breaches are much more likely to become victims of identity fraud than those who have not. Data Breach victims who do experience identity theft often spend hundreds of hours fixing the damage caused by identity thieves.[32] Plaintiffs and Class Members generally have spent considerable time and stress in attempting to mitigate the present and future harms caused by the breach. The U.S. Department of Justice's Bureau of Justice Statistics has reported that, even if data thieves have not caused financial harm, data breach victims "reported spending an average of about 7 hours clearing up the issues."[33]

64. The information compromised in the Data Breach—including detailed medical information—is much more valuable than the loss of credit card information in a retailer data breach. There, victims can simply close their credit and debit card accounts and potentially even rely on automatic fraud protection offered by their banks. Here, however, the information compromised is much more

---

[32] *Identity Theft: Protect Yourself, Secure Your Future*, MARYLAND OFFICE OF THE ATTORNEY GENERAL, https://www.marylandattorneygeneral.gov/ID%20Theft%20Documents/Identitytheft.pdf (last accessed July 2, 2025).

[33] Erika Harrell, *Victims of Identity Theft, 2014*, U.S. DEP'T OF JUSTICE, https://bjs.ojp.gov/content/pub/pdf/vit14.pdf. (last accessed July 2, 2025).

difficult, if not impossible, for consumers to re-secure after being stolen because it goes to the core of their identity. An individual's medical history and assessments are permanent and are impossible to escape. The loss of all this medical data puts Plaintiffs and Class Members at additional risk for potential medical fraud and medical identity theft.

65. Data breaches and disclosures involving medical records are not only incredibly costly, they can "also [be] more difficult to detect, taking almost twice as long as normal identity theft."[34] The FTC warns that a thief may use private medical information to, among other things, "see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care"[35] and that this may have far reaching consequences for a victim's ability to access medical care and use insurance benefits.

**V. Defendant Failed to Comply with Industry Standards**

66. Security standards for businesses storing PII and PHI commonly include, but are not limited to:

a) Maintaining a secure firewall;

b) Monitoring for suspicious or unusual traffic on the website;

---

[34] *What to Know About Medical Identity Theft*, FEDERAL TRADE COMMISSION CONSUMER INFORMATION, https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Nov. 22, 2023).

[35] *Id.*

c) Looking for trends in user activity including for unknown or suspicious users;

d) Looking at server requests for PII;

e) Looking for server requests from VPNs and Tor exit nodes;

f) Requiring Multi-factor authentication before permitting new IP addresses to access user accounts and PII;

g) Structuring a system including design and control to limit user access as necessary, including a user's access to the account data and PII of other users.

67. Other best practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

68. Defendant failed to meet minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR- DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM- 06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIC CSC), which are all established standards in reasonable cybersecurity readiness.

69. These frameworks are existing and applicable healthcare industry standards which Defendant failed to comply with.

## VI. Defendant Failed to Comply with HIPAA Guidelines

70. HIPAA requires business associates such as Defendant to protect against reasonably foreseeable threats to the security of sensitive patient health information.

71. Business associates must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

72. Title II of HIPAA contains the Administrative Simplification provisions, which require that the Department of Health and Human Services ("HHS") create rules to streamline standards for handling PII like the data that was not adequately safeguarded by Defendant.

73. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII/PHI is properly maintained.[36]

[36] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

74. The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's safety failures include, but are not limited to:

a) Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b) Failing to protect against any reasonably anticipated threats or hazards to the security and integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c) Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d) Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e) Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f) Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g) Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

## VII. Plaintiffs' and Class Members' Experiences

***Plaintiff Monsoor***

75. Upon information and belief, Plaintiff Raymond Monsoor provided his sensitive PII and PHI to Mayo Clinic for his eyecare, and Defendant received his Private Information from Mayo Clinic.

76. Plaintiff Monsoor received notice of the Data Breach on or around July 14, 2025, informing him that his sensitive information was part of Defendant's Data Breach.[37]

77. Plaintiff Monsoor provided Defendant with his most sensitive medical and personal information and cannot be sure how much of it was exfiltrated.

78. Plaintiff Monsoor has reported increased anxiety since learning of the Data Breach.

79. Plaintiff Monsoor suffered an actual injury in the form of damages and diminution in the value of his Private Information—a form of tangible property that Plaintiff Monsoor entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff Monsoor suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

[37] *See* Exhibit A.

80. Plaintiff Monsoor has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

81. Plaintiff Monsoor has a continuing interest in ensuring that his Private Information, which upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff Porras***

82. Plaintiff Porras received notice of the Data Breach on or around July 18, 2025, informing her that her sensitive information was part of Defendant's Data Breach.

83. Upon information and belief, Plaintiff Porras's eyecare insurance provider is Kaiser, but she has also obtained eyecare services from Costco and Walmart.

84. Plaintiff Porras has used CreditKarma for several years.

85. Plaintiff Porras took reasonable precautions before the Data Breach, including maintenance of a small digital footprint.

86. Plaintiff Porras provided Defendant with her most sensitive medical and personal information and cannot be sure how much of it was exfiltrated.

87. Plaintiff Porras suffered an actual injury in the form of damages and diminution in the value of her Private Information—a form of tangible property

that Plaintiff Porras entrusted to Defendant, which was compromised in and because of the Data Breach. Plaintiff Porras suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

88. Plaintiff Porras has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of criminals.

89. Plaintiff Porras has a continuing interest in ensuring that her Private Information, which upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**VIII. Defendant Breached its Obligations to Plaintiffs and the Class**

90. Defendant fails to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, out-of-pocket costs, and the time taken by Plaintiffs and Class Members to mitigate their injuries.

91. Plaintiffs and Class Members have been damaged by the compromise and exfiltration by cyber-criminals of their Private Information as a result of the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of the Data Breach.

92. Plaintiffs and Class Members were damaged since their Private Information is being sold or potentially for sale by cybercriminals in the years to come.

93. As a direct and proximate consequence of Defendant's conduct, Plaintiffs and Class Members have been placed at an imminent, actual, and substantial risk of harm from fraud and identity theft, especially considering the actual fraudulent misuse of the Private Information that has already taken place.

94. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

95. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

96. Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private

Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

97. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cybercriminals in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

98. Cybercriminals sell health information at a far higher premium than stand-alone PII. This is because health information enables thieves to go beyond traditional identity theft and obtain medical treatments, purchase prescription drugs, submit false bills to insurance companies, or even undergo surgery under a false identity.[38] The shelf life for this information is also much longer—while individuals can update their credit card numbers, they are less likely to change their health insurance information. When medical identity theft occurs, the associated costs to victims can be exorbitant. According to a 2015 study, at least 65% of medical identity theft victims had to "pay an average of $13,500 to resolve the crime."[39]

---

[38] Medical Identity Theft: FAQs for Health Care Providers and Health Plans, FEDERAL TRADE COMMISSION, *available at* https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft-faq-health-care-health-plan.pdf (last accessed Jan. 8, 2024).

[39] Justin Klawans, *What is medical identity theft and how can you avoid it?*, THE WEEK (Aug. 2, 2023), https://theweek.com/feature/briefing/1025328/medical-identity-theft-how-to-avoid (last accessed July 23, 2025).

99. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

100. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a) Finding fraudulent charges;

b) Cancelling and reissuing credit and debit cards;

c) Purchasing credit monitoring and identity theft prevention;

d) Monitoring their medical records for fraudulent charges and data;

e) Addressing their inability to withdraw funds linked to compromised accounts;

f) Taking trips to banks and waiting in line to obtain funds held in limited accounts;

g) Placing "freezes" and "alerts" with credit reporting agencies;

h) Spending time on the phone with or at a financial institution to dispute fraudulent charges;

i) Contacting financial institutions and closing or modifying financial accounts;

j) Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k) Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l) Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

101. Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password protected.

102. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a Data Breach victim mitigate their injuries, and conversely, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach since April 2025, and did not notify all victims until July 2025.[40] Yet Defendant offered no explanation or purpose of the delay. This delay violates HIPAA and other notification requirements and increased injuries to Plaintiffs and the Class.

[40] *See* Exhibit A.

## CLASS ACTION ALLEGATIONS

103. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and those similarly situated.

104. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following class (the "Nationwide Class") and, if appropriate, subclasses (the "State Subclasses"):

**Nationwide Class**

> All persons in the United States who were impacted by the Data Breach discovered by Defendant in April 2025, including all those who received notice of the breach.

**Minnesota Subclass**

> All persons in the State of Minnesota who were impacted by the Data Breach discovered by Defendant in April 2025, including all those who received notice of the breach.

**Oregon Subclass**

> All persons in the State of Oregon who were impacted by the Data Breach discovered by Defendant in April 2025, including all those who received notice of the breach.

105. Excluded from the Nationwide Class are governmental entities, Defendant, any entity in which Defendant have a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the

Nationwide Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

106. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements therein.

107. **Numerosity.** The Nationwide Class is so numerous that the individual joinder of all members is impracticable. Defendant has reported to the United States Department of Human and Health Services that 240,961 individuals were affected by the Data Breach.

108. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendant failed to take adequate and reasonable measures to ensure its website and data systems were protected;

b) Whether Defendant failed to take available steps to prevent and stop the breach from happening or mitigating the risk of a long-term breach;

c) Whether Defendant unreasonably delayed in notifying subscribers of the harm they suffered once the suspicious activity was detected;

d) Whether Defendant owed a legal duty to Plaintiffs and Class Members to protect their PII and PHI;

e) Whether Defendant breached any duty to protect the personal information of Plaintiffs and Class Members by failing to exercise due care in protecting their PII and PHI;

f) Whether Defendant's conduct violated the statutes as set forth herein;

g) Whether Defendant took sufficient steps to secure Class Members' Private Information;

h) Whether Defendant was unjustly enriched;

i) Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

j) Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief or restitution.

109. **Typicality.** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way.

110. **Adequacy of Representation.** Plaintiffs are adequate class representatives because they are Class Members, and their interests do not conflict with the Nationwide Class's interests. Plaintiffs retained counsel who are competent and experienced in class action and data breach litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the Nationwide Class's benefit and will fairly and adequately protect their interests.

111. **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate

over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Nationwide Class Member's claim is impracticable. Even if each Nationwide Class Member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

112. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant. S uch individual actions would create a risk of adjudications that would be dispositive of the interests of other Nationwide Class Members and impair their interests.

Defendant has acted and/or refused to act on grounds generally applicable to the Nationwide Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count 1
### Negligence
### On behalf of Plaintiffs and the Nationwide Class

113. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

114. Plaintiffs were required to provide PII and PHI as a precondition for receiving eyecare services from Defendant. Plaintiffs and Class Members entrusted their PII and PHI to Defendant with the understanding that it would safeguard their PII and PHI.

115. Defendant had full knowledge of the sensitivity of the PII and PHI that it stored and the types of harm that Plaintiffs and Class Members could and would suffer if that PII and PHI were wrongfully disclosed.

116. Defendant violated its duty to implement and maintain reasonable security procedures and practices. That duty includes, among other things, designing, maintaining, and testing Defendant's and Defendant's contractors' information security controls sufficiently rigorously to ensure that PII and PHI in

its possession was adequately secured by, for example, encrypting sensitive personal information, installing effective intrusion detection systems and monitoring mechanisms, using access controls to limit access to sensitive data, regularly testing for security weaknesses and failures, failing to notify patients of the specific breached data in a timely manner, and failing to remedy the continuing harm by unreasonably delaying notifying specific victims who were harmed.

117. Defendant's duty of care arose from, among other things,

a) The special relationship between Defendant and its customers resulting from Plaintiffs and Class Members entrusting Defendant with confidential PII/PHI;

b) Defendant's exclusive ability (and Class Members' inability) to ensure that its systems, website, and vendor services were sufficient to protect against the foreseeable risk that a data breach could occur;

c) HIPAA, which requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1);

d) Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, failing to adopt reasonable data security measures; and

e) Defendant's common law duties to adopt reasonable data security measures to protect customer PII and PHI and to act under the same or similar circumstances as a reasonable and prudent person would act.

118. Plaintiffs and Class Members were the foreseeable victims of Defendant's inadequate data security. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches. Defendant knew that a breach of its systems or its contractors' systems could and would cause harm to Plaintiffs and Class Members.

119. Defendant's conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's conduct included its failure to adequately mitigate harm through negligently failing to inform victims of the breach of the specific information breached for (as of time of writing) more than two months after the purported first discovery of the breach.

120. Defendant knew or should have known of the inherent risks in collecting and storing massive amounts of PII and PHI and the importance of limiting disclosure of that PII and PHI.

121. Defendant, through its actions and inactions, breached its duty owed to Plaintiffs and Class Members by failing to exercise reasonable care in safeguarding their PII and PHI while it was in its possession and control. Defendant breached its duty by, among other things, its failure to adopt reasonable data security practices and their failure to adopt reasonable security and notification practices, failure to monitor the security of its networks and systems,

and allowing unauthorized access to Plaintiffs' and Class Members' Private Information.

122. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs' and Class Members' injuries-in-fact.

123. Defendant inadequately safeguarded PII and PHI in breach of standard industry rules, regulations, and best practices at the time of the Data Breach.

124. But for Defendant's breach of its duty to adequately protect Class Members' PII and PHI, Class Members' PII and PHI would not have been stolen.

125. There is a temporal and close causal connection between Defendant's failure to implement adequate data security measures and notification practices, the Data Breach/unauthorized disclosure, and the harms suffered by Plaintiffs and Class Members.

126. As a result of Defendant's failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

127. As a direct and traceable result of Defendant's negligence, Plaintiffs and Class Members suffered and will continue to suffer damages, including monetary damages, increased risk of future harm, loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach, overpayment for the services and products that were received without adequate data security; and embarrassment, humiliation, and emotional distress.

128. Plaintiffs and Class Members are entitled to all forms of monetary compensation set forth herein, including monetary payments to provide adequate identity protection services. Plaintiffs and Class Members are also entitled to the injunctive relief sought herein.

129. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Count 2**
**Negligence *Per Se***
**On behalf of Plaintiffs and the Nationwide Class**

130. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

131. Section 5 of the FTC Act, 15 U.S.C. § 45 prohibits, "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information.

132. Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with industry standards.

133. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems. Plaintiffs were required to provide PII and PHI to Defendant. Plaintiffs and Class Members entrusted their PII and PHI to Defendant with the understanding that Defendant would safeguard their PII and PHI.

134. Class Members are within the class of persons Section 5 of the FTC Act (and similar state statutes) was intended to protect.

135. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

136. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals,

as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304 (defining "encryption").

137. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

138. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

139. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it failed to meet its duties, and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

140. As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**Count 3**
**Breach of Implied Contract**
**On behalf of Plaintiffs and the Nationwide Class**

141. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

142. Plaintiffs and Class Members entered into an implied contract with Defendant when they entrusted their eyecare providers with their PII and PHI as a precondition for receiving eyecare services.

143. Plaintiffs and Class Members are third-party beneficiaries of contracts entered into by Ocuco and the eyecare providers possessing the Private Information and Plaintiffs and Class Members. It is because of the contracts between Ocuco and said eyecare providers that Ocuco came to possess the Private Information of Plaintiffs and the Class Members.

144. Pursuant to these contracts, the aforementioned eyecare providers paid money to Ocuco and provided Ocuco with Plaintiffs' Private Information. In exchange, Ocuco agreed to: (1) provide eyecare-related services to Plaintiffs and Class Members, (2) use Plaintiffs' and Class Members' Private Information to facilitate providing eyecare-related services involving Plaintiffs and Class Members, (3) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' Private Information; and (4) protect Plaintiffs'

and Class Members' Private Information in compliance with federal and state laws and regulations, industry standards, and Ocuco's representations regarding its security and privacy practices.

145. As part of these transactions, Defendant agreed to safeguard and protect the PII of Plaintiffs and Class Members and to timely and accurately notify them if their PII or PHI was breached or compromised.

146. Plaintiffs and Class Members entered into the implied contracts with the reasonable expectation that Defendant's data security practices and policies were reasonable and consistent with the legal requirements, industry standards, and Defendant's own representations. Plaintiffs and Class Members believed that Defendant would use part of the monies paid to Defendant under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund proper and reasonable data security practices.

147. Implicit in the agreement between Defendant, Plaintiffs, and Class Members was the obligation that both parties would maintain information confidentially and securely.

148. These exchanges constituted an agreement and meeting of the minds between the parties.

149. When the parties entered into an agreement, mutual assent occurred. Plaintiffs and Class Members would not have provided and entrusted their PII and

PHI to Defendant in the absence of the implied contract or implied terms between them and Defendant. The safeguarding of the PII and PHI of Plaintiffs and Class Members was critical to realize the intent of the parties.

150. Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

151. Defendant breached its implied contracts with Plaintiffs and Class Members to protect their PII and PHI when they (1) failed to take reasonable steps to use safe and secure systems to protect that information; (2) failed to comply with industry standards; (3) failed to comply with the legal obligations necessarily incorporated into these agreements; and; (4) failed to notify Plaintiffs and Class Members of the specific data breached in a reasonably timely manner.

152. As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring,

identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

153. As a direct and proximate result of the breach/unauthorized disclosure, Plaintiffs and Class Members are entitled to relief as set forth herein.

154. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Count 4**
**Unjust Enrichment**
**On behalf of Plaintiffs and the Nationwide Class**

155. Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

156. This count is brought in the alternative to Plaintiffs' breach of contract claim.

157. Plaintiffs and Class Members conferred a benefit on Defendant by permitting their eyecare providers to turn over their Private Information to Defendant. Moreover, upon information and belief, Plaintiffs allege that payments made by Defendant's clients to Defendant included payment for cybersecurity protection, and that those cybersecurity costs were passed on to Plaintiffs and Class Members in the form of elevated prices charged by Ocuco's clients for their services. Plaintiffs and Class Members did not receive such cybersecurity protection. Specifically, they paid Defendant and/or Defendant's clients for eyecare services and provided Defendant with their PII and PHI. In exchange, Defendant should have provided adequate data security for Plaintiffs and Class Members.

158. Upon information and belief, Defendant funds its data security measures and website from its general revenue, including payments made by its clients on behalf of Plaintiffs and Class Members.

159. As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security including the protection of the data from inadvertent disclosure to third parties. Defendant's website and its security and privacy measures are entirely under the sole control of Defendant.

160. Defendant, however, failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

161. Defendant would not be able to carry out an essential function of its regular business without the money and Private Information provided by its clients. Plaintiffs and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

162. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

163. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it, which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiffs' and Class Members' Private Information and prevented the Data Breach.

164. If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have provided their Private Information to Defendant.

165. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and cheaper contractors and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of their Private Information.

166. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained from Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

167. Plaintiffs and Class Members have no adequate remedy at law.

168. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered or will suffer injuries that include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, medical identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their

privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII and PHI; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Defendant's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

169. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members were underpaid by Defendant.

170. Plaintiffs also seek such other relief as the Court may deem just and proper.

**Count 5**
**Violation of the Minnesota Deceptive Trade Practices Act ("MDTPA")**
**Minn. Stat. § 325D.43**
**On behalf of Plaintiff Monsoor and the Minnesota Subclass**

171. Plaintiff Monsoor, individually and on behalf of the Minnesota Subclass, realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

172. Minnesota affords a cause of action to any person harmed by an entity's use of deceptive trade practices. Minn. Stat. § 352.45, Subd. 3.

173. Under MDTPA, a "person engages in a deceptive trade practice when, in the course of business, vocation or occupation, the person . . . engaged in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices[.]" Minn. Stat. § 325D.44, subd. 1(13).

174. Defendant engaged in conduct that violated the MDTPA.

175. Defendant collected and stored Plaintiff Monsoor's and the Minnesota Subclass's Personal Information. Defendant stored the Personal Information in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Plaintiffs' and the Class's information, and failing to adequately segment the sensitive data from other parts of its servers and networks.

176. Defendant's failure to comply with basic data security necessary to protect any stored data, constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to thousands of individuals. That is especially true because, despite failing to reasonably protect Plaintiff Monsoor's and the Minnesota Subclass's highly sensitive Private Information, Defendant gained significant profit from that information. Indeed, a significant part of Defendant's revenue was the "unfettered" use, analysis, and sale of data related to Plaintiff Monsoor's and the Minnesota Subclass's Private Information. While Defendant profited off of Plaintiff Monsoor's and the Minnesota Subclass's data, it failed to take the necessary measures to protect it, leaving Plaintiff Monsoor and the Minnesota Subclass at significant and foreseeable risk of harm.

177. As a result of those unlawful and unfair business practices, Plaintiff Monsoor's and the Minnesota Subclass's highly sensitive and private health and medical information was put at foreseeable risk of unauthorized access, theft, and acquisition. That risk materialized with the Data Breach, where hackers obtained and successfully exfiltrated the Private Information over thousands of individuals. Subsequently, the stolen information was posted on the dark web, exposing their private and personal information and putting patients at a substantial risk of misuse of their data.

178. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiff Monsoor suffered significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of his identity, name and likeness; (3) fraud and identity theft from the misuse of his stolen Private Information; (4) diminution in the value of his Private Information due to the loss of security, confidentiality, and privacy; (5) lost value of his Private Information; (6) emotional and mental distress and anguish resulting from the access, theft and posting of his Private Information; (7) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of his Private Information.

179. Plaintiff Monsoor and the Minnesota Subclass also remain at heightened risk of future injury because their information resides with Defendant. Without the use of adequate data security, Plaintiff Monsoor and the Minnesota Subclass remain at a heightened and substantial risk that their Private Information will be subject to another data breach.

180. Plaintiff Monsoor and the Minnesota Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees;

injunctive relief; and any other relief available by law and to which the court deems proper.

**Count 6**
**Violation of the Minnesota Health Records Act ("MHRA")**
**Minn. Stat. §§ 144.291 and 144.293**
**On behalf of Plaintiff Monsoor and the Minnesota Subclass**

181. Plaintiff Monsoor, individually and on behalf of the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

182. Under the Minnesota Health Records Act, "health record" means any information, whether oral or recorded in any form or medium, that relates to the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment for the provision of healthcare to a patient. Minn. Stat. § 144.291, subd. 2(c).

183. The Private Information of Plaintiff Monsoor and the Minnesota Subclass that was released in the Data Breach involved health records as that term is defined in the MHRA.

184. Plaintiff Monsoor and the Minnesota Subclass are "patients" as that term is defined under the MHRA at all times relevant to this action under Minn. Stat. § 144.291, subd. 2(g).

185. Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the patient or the patient's legally authorized representative's consent,

specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Stat. § 144.293, subd. 2(1-3).

186. Via the Data Breach, Defendant released Plaintiff Monsoor's and the Minnesota Subclass's health records, which were actually accessed, viewed, and obtained by cybercriminals.

187. Neither Plaintiff Monsoor nor the Minnesota Subclass consented to have their health records released in the Data Breach.

188. Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorney fees. Minn. Stat. § 144.298, subd. 2. As a result of Defendant's violations of the MHRA, Plaintiff Monsoor and the Minnesota Subclass members seek all damages authorized by law, including compensatory damages plus costs, and reasonable attorney fees.

**Count 7**
**Violation of Or. Rev. Stat. § 646.608 *et seq.***
**On behalf of Plaintiff Porras and the Oregon Subclass**

189. Plaintiff Porras, individually and on behalf of the Oregon Subclass, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

190. Oregon Revised Statute § 646.608 prohibits any person engaging in an unlawful practice in the course of their business. A person does so by engaging in "unfair or deceptive conduct in trade or commerce."

191. Defendant violated Oregon Revised Statute § 646.608 by engaging in conduct that constituted "unfair or deceptive conduct."

192. Defendant collected and stored Plaintiff Porras's and the Oregon Subclass's Private Information. Defendant stored the Private Information in a knowingly unsafe and unsecured manner by, among other things, failing to dispose of data no longer needed for any legitimate business purpose, maintaining the data on an unsecured database in an unencrypted format, failing to adequately monitor activity on the servers containing Plaintiff Porras's and the Oregon Subclass's information, and failing to adequately segment the sensitive data from other parts of Defendant's networks.

193. Defendant's failure to comply with basic data security necessary to protect any stored data constitutes immoral, unethical, oppressive, and unscrupulous conduct that caused substantial harm to thousands of people. That is especially true because, despite failing to reasonably protect Plaintiff Porras's and the Oregon Subclass's highly sensitive Private Information, Defendant gained significant profit from that information. Indeed, a significant part of Defendant's revenue was the "unfettered" use, analysis, and sale of data related to Plaintiff

Porras's and the Oregon Subclass's Private Information. While Defendant profited off of Plaintiff Porras's and the Oregon Subclass's data, it failed to take the necessary measures to protect it, leaving Plaintiff Porras and the Oregon Class at significant and foreseeable risk of harm.

194. As a direct and proximate result of Defendant's inadequate security and the resulting Data Breach, Plaintiff Porras suffered significant injuries, including, but not limited to: (1) loss of privacy; (2) misappropriation of her identity, name and likeness; (3) fraud and identity theft from the misuse of her stolen Private Information; (4) diminution in the value of her Private Information due to the loss of security, confidentiality, and privacy; (5) lost value of her Private Information; (6) emotional and mental distress and anguish resulting from the access, theft and posting of her Private Information; (7) lost time, effort and expense responding to and preventing the threats and harm posed by the Data Breach; and (8) a continued substantial and imminent risk of the misuse of her Private Information.

195. Plaintiff Porras and the Oregon Subclass also remain at heightened risk of future injury because their information resides with Defendant. Without the use of adequate data security, Plaintiff Porras and the Oregon Subclass remain at a heightened and substantial risk that their Private Information will be subject to another data breach.

196. Plaintiff Porras and the Oregon Subclass seek all monetary and non-monetary relief allowed by law, including any: economic damages; damages for emotional and mental anguish; nominal damages; enhanced or treble damages available under the law; court costs; reasonable and necessary attorneys' fees; injunctive relief; and any other relief available by law and to which the court deems proper.

**Count 8**
**Injunctive/Declaratory Relief**
**On behalf of Plaintiffs and the Nationwide Class**

197. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal and state statutes described herein.

198. Defendant owes a duty of care to Plaintiffs and Class Members, which required Defendant to adequately monitor and safeguard Plaintiffs' and Class Members' PII and PHI.

199. Defendant and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns still possess the PII and PHI belonging to Plaintiffs and Class Members.

200. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and PHI and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII and PHI. Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs and the Class continue to suffer injury as a result of the compromise of their PII and PHI and the risk remains that further compromises of their private information will occur in the future.

201. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a) Defendant owes a legal duty to adequately secure the PII and PHI of Plaintiffs and the Class within its care, custody, and control under the common law, HIPAA, and Section 5 of FTC Act;

b) Defendant breached its duty to Plaintiffs and the Class by allowing the Data Breach to occur;

c) Defendant's existing data monitoring measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect the PII and PHI of Plaintiffs and the Class within Defendant's custody, care, and control; and

d) Defendant's ongoing breaches of said duties continue to cause harm to Plaintiffs and the Class.

202. This Court should also issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with

healthcare industry standards to protect the PII and PHI of Plaintiffs and the Class within its custody, care, and control, including the following:

a) Order Defendant to provide lifetime credit monitoring and identity theft insurance and protection services to Plaintiffs and Class Members; and

b) Order that, to comply with Defendant's obligations and duties of care, Defendant must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems, networks, and servers on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

ii. Encrypting and anonymizing the existing PII and PHI within its servers, networks, and systems to the extent practicable, and purging all such information which is no longer reasonably necessary for Defendant to provide adequate medical services to its patients;

iii. Engaging third-party security auditors and internal personnel to run automated security monitoring;

iv. Auditing, testing, and training its security personnel regarding any new or modified procedures;

v. Segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems, networks, and servers;

vi. Conducting regular database scanning and security checks; and

vii. Routinely and continually conducting internal training and education to inform Defendant's internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

203. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach or cybersecurity incident. This risk is real, immediate, and substantial. If another data breach or cybersecurity incident occurs, Plaintiffs and the Class will not have an adequate remedy at law because monetary relief alone will not compensate Plaintiffs and the Class for the serious risks of future harm.

204. The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and the Class will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of Defendant's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

205. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach or cybersecurity incident, thus preventing future injury to Plaintiffs and the Class and other persons whose PII and PHI would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully request the following relief:

A. That the Court certify this action as a class action and appoint Plaintiffs and their counsel to represent the Class;

B. That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendant to adequately safeguard the PII and PHI of Plaintiffs and the Class by implementing improved security controls;

C. That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D. That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of Defendant's unlawful acts, omissions, and practices;

F. That the Court award to Plaintiffs and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G. That the Court award pre- and post-judgment interest at the maximum legal rate; and

H. All such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: July 23, 2025

Respectfully submitted,

**MILLER SHAH LLP**

*/s/ Nathan C. Zipperian*
Nathan C. Zipperian
Fl. Bar ID #61525
2103 N. Commerce Parkway
Fort Lauderdale, FL 33326
Telephone: (866) 540-5505
nczipperian@millershah.com

Amber L. Schubert **pro hac vice* forthcoming
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Tel: 415-788-4220
Fax: 415-788-0161
aschubert@sjk.law

*Counsel for Plaintiffs and the Proposed Class*